**Joseph ANDERSON, Jr., Plaintiff,**

v.

**ANHEUSER–BUSCH, INC., Defendant.**

**No. 98CIV.0070(RWS).**

United States District Court,
S.D. New York.

Oct. 15, 1999.

220

Mr. Joseph Anderson, Jr., Raleigh, NC, for pro se.

Connell, Foley & Geisler, Roseland, NJ, John K. Bennett, Maureen McLoughlin, of counsel, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Anheuser–Busch, Inc. ("ABI") has moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment to dismiss the complaint of plaintiff Joseph Anderson, Jr., *pro se* ("Anderson"), which alleges a discriminatory discharge on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1, *et seq.* ("Title VII"). For the reasons set forth below, the motion will be granted, and the complaint dismissed with prejudice.

Title VII has been a breeding ground for challenging issues, particularly where, as here, the plaintiff is proceeding *pro se.* The instant motion raises difficult questions arising from the interplay between the state and federal administrative agencies having responsibility in this field, from Anderson's conduct in pursuing his claims (for which ABI has asserted a laches defense), and from the determination and application of the facts in a summary context to the legal sufficiency of Anderson's complaint. What follows, hopefully, will reveal the complexity of these issues and set forth appropriately the reasoning on which Anderson will be denied the relief he has sought.

### The Parties

Anderson, who is black, was employed by ABI for approximately four years. He was fired in November 1985 under circumstances which he alleges constitute a violation of Title VII.

ABI is a Missouri corporation selling its products nationally. ABI maintained a national sales force in which Anderson was employed at the time of his discharge.

### Prior Proceedings

On January 7, 1998, Anderson filed a complaint alleging that he was discriminatorily discharged by ABI in November 1985. ABI defaulted in early pretrial proceedings, but the default was vacated by order of June 22, 1998. Discovery disputes were subsequently resolved.

ABI's instant motion for summary judgment was filed on June 4, 1999. Papers were received through August 30, 1999, at which point the motion was deemed fully submitted.

### The Facts

Pursuant to Local Rule 56.1, ABI has submitted a statement of material facts, and Anderson has submitted correspondence with exhibits which will be treated as a counter-designation of facts. What follows is gleaned from these submissions, with any factual inferences drawn in Anderson's favor.

In September 1981, ABI hired Anderson as an area manager at its Pearl River, N.Y. office. In August 1983, ABI promoted Anderson to national accounts zone manager, a position which entailed cultivating and maintaining relationships with ABI's national accounts, which are companies having sales or distribution responsibilities overlapping a division or region. James Cloud ("Cloud"), ABI's Director of National Sales East and Anderson's direct supervisor, made the decision to promote Anderson to zone manager.

In December 1984, Cloud promoted Anderson from zone manager to zone manager two, which made Anderson responsible for larger accounts and resulted in a raise. Prior to the fall of 1985, ABI had been generally satisfied with Anderson's job performance. Anderson described his first four years at ABI as "very positive" and "exciteful."

In the fall of 1985, ABI was notified—in a manner not clear on the record before the Court—that Stephen Anglim ("Anglim"), a representative from the Long Island Railroad, one of ABI's national accounts for which Anderson was responsible, had apparently not seen Anderson for approximately three months, which Anglim found unusual.

Anglim's comment prompted ABI to review Anderson's call and expense reports. A "call report" is a document on which ABI managers are required to identify the accounts with whom they have met or "called upon" during a particular week. An "expense report" is a document ABI managers submit seeking reimbursement for business-related expenses. As a zone manager, Anderson was required to submit a "weekly reporting package" that included a call report, an expense report, and a summary cover sheet for Cloud's review, in order to keep Cloud abreast of Anderson's schedule. Cloud reviewed Anderson's call and expense reports and found them inconsistent with Anglim's complaint since the reports indicated several recent meetings with Anglim.

Cloud consulted Daniel Williams ("Williams"), ABI's Director of Technical Assistance, who was black, about conducting an investigation of the apparent discrepancies in Anderson's call and expense reports. ABI's Auditing and Systems Department was directed to conduct an audit of Anderson's call and expense reports for the previous ten months—January 1 through October 1, 1985. ABI's Audit Department found that Anderson's restaurant receipts were suspect because he had used receipts "indiscriminately" to support entertainment charges. The Audit Department concluded that Anderson's entertainment charges were not adequately supported and should be disallowed.

On October 23, 1985, Cloud and Paul Morrissey ("Morrissey"), an ABI Vice-President, summoned Anderson to ABI headquarters in St. Louis. Anderson apparently went under the impression that he was going to be given a raise. However, Cloud and Morrissey told him that ABI had reason to believe he had falsified his call and expense reports relating to several accounts, including Convenient Food Markets, Melmarkets, the Long Island Railroad, Nassau Coliseum, and the Michelob Gold Tournament. Anderson was further told that, in accordance with ABI's Dismissal and Suspension Policy, he was suspended for 30 days with pay to provide ABI additional time to investigate the apparent discrepancies in his reports. ABI's Dismissal and Suspension Policy provides that falsification of documents, such as call and expense reports, may be grounds for termination. At the meeting, Cloud and Morrissey instructed Anderson that he was not to contact his accounts during his 30-day suspension. Anderson requested but did not receive any documentation of the charges against him. Anderson also requested that Cloud or Morrissey call Anderson's accounts right there to verify the supposed falsifications, but Cloud and Morrissey declined to do so.

By letter dated October 30, 1985, Anderson informed Cloud that he had contacted several of his accounts on October 24, 1985, the day after he was told not to contact his accounts for the next 30 days. Those contacted included Keith Gooden of Harbor Distributing, Richard Makse of the Long Island Railroad, Brian Conlon of Nassau Coliseum, and Larry Wright of Convenient Foodmart. Anderson asked these accounts to write letters of support for him. The letters were not provided to ABI until the hearings before the New York State Department of Human Rights ("NYSDHR") described below.

Cloud met with several of Anderson's contacts at ABI's national accounts, including Anglim, who reported Anderson had called on him on only one of the four occasions Anderson had listed in his call reports. Then, on November 25, 1985, Cloud and Morrissey met with Anderson and informed him that their investigation confirmed he had falsified his call and

expense reports relating to at least one of his accounts, the Long Island Railroad. Apparently, accusations relating to some of Anderson's other accounts could not be verified and did not form the basis for Anderson's subsequent termination. Anderson was shown several of his reports, including a call report indicating he had met with Anglim and/or Makse of the Long Island Railroad on July 8, 1985, and an expense report dated July 13, 1985, for which he was reimbursed $62.00, indicating he had lunch with Anglim and Makse. Anglim had informed Cloud that he had "lost" Anderson in the month of July and did not see him in person.

Anderson was also shown a call report dated July 24, 1985, indicating he had met with Anglim and Makse, and an expense report, for which he was reimbursed $70.00, indicating that on July 25, 1985, he entertained Makse and Anglim at Louie's Shore Restaurant. Anderson admitted he did not entertain Makse or Anglim on July 25, 1985.

Anderson was further questioned about an expense report indicating he had entertained a representative of Harbor Distributors on October 17, 1985 at McCauley's Restaurant. Anderson stated that he had not entertained anyone from Harbor Distributors at McCauley's Restaurant in October 1985, but, rather, had bought lunch at McCauley's for a representative of Beck's, an ABI competitor. He admitted that he had submitted false documents to the company, exercised "bad judgment" in deliberately listing the wrong individuals on several of his call and expense reports, and knew his actions were wrong. On November 25, 1985, Anderson was discharged by ABI.

On December 20, 1985, Anderson forwarded a 20–page "statement" to Edward W. Foles ("Foles"), a supervisor in NYSDHR's New York City office, recounting the circumstances of the termination of his employment at ABI. In his letter, Anderson stated his responsibilities with respect to the development of the market for ABI in the black community and stated, in addition, that:

> During the week of October 27, 1985, he contacted his accounts to ask them if they had complained about him to Mr. Cloud;
>
> At least one of his call reports was inaccurate;
>
> Two of his expense reports were "in fact false as to the extent that [he] did not enter the proper names of the parties with whom [he] dined";
>
> He ate lunch with a competitor but "was afraid" to include the competitor's name in his expense report, so he included a false name in his report seeking reimbursement for the meal;
>
> He ate lunch with a "black tavern owner and businessman," but "was afraid" to include his name on his expense report, so he included a false name in his report seeking reimbursement for the meal; and
>
> He submitted expense reports with false information.

In his letter Anderson questioned why he was terminated rather than reprimanded and noted that he was the one black employee in a department of fifty, that only blacks had been interviewed for the position for which he was employed, and that five members had been reprimanded or demoted for misconduct without discharge.

On December 27, 1985, Anderson filed a charge of discrimination with the EEOC's Newark office, alleging that ABI had terminated his employment based on his race. In his charge, Anderson alleged:

> I believe that I was suspended and subsequently terminated because of race (black) for the following reasons:
>
> 1. My employer made bogus charges as a pretext to suspend me.
>
> 2. I was terminated for a practice that although is a violation of company policy is not uncommon.
>
> 3. I was commonly referred to as a "token."

4. Tom Forget, my counterpart, is guilty of the same and worse violations of policy and no action was ever taken against him.

On or about January 9, 1986, pursuant to the agencies' Worksharing Agreement, the EEOC deferred Anderson's charge to the NYSDHR for processing, investigation, fact-finding, and final decision. On January 10, 1986, the EEOC forwarded a notice of its deferral of Anderson's charge to ABI. The deferral stated in relevant part:

The EEOC will give weight to the NYSDHR's final findings and orders in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true;

In many instances, the EEOC will take no further action, thereby avoiding the necessity of an investigation by both the NYSDHR and the EEOC;

The EEOC will honor a request to review the final decision and order of the NYSDHR, if a party to the charge notified the EEOC in writing within 15 days of receipt of the NYSDHR's final decision and order; and

If the NYSDHR terminates its proceedings without issuing a final finding and order, then the EEOC will contact the parties to the charge.

After being notified that Anderson had filed a charge containing allegations relating to Forget, Williams ordered an audit of Forget's call and expense reports for the year January 1, 1985 to January 1, 1986. ABI's audit of Forget's expense reports stated:

Our review did not show the use of generic restaurant receipts or identify any inflated restaurant receipts.

Anderson's analysis of Forget's mileage records indicated that his reports with respect to one of his accounts were false. In April 1987, Anderson submitted a four-page letter to the NYSDHR in which he again admitted:

[I] was guilty of using poor judgment in not entering the proper names of individuals that I did in fact entertain on the dates shown and places shown and in the amounts shown on the expense reports presented by Mr. Cloud on November 25, 1985 and included in the charges used in my termination.

He claimed that three complaints had been made by black employees against actions of Cloud. He again claimed that he had been treated discriminatorily relative to Forget.

In July 1990, the NYSDHR issued a probable cause finding based on the need to resolve credibility issues, and advised the parties they would be notified of further proceedings. On or about December 10, 1990, the NYSDHR notified ABI's attorney and Anderson's appointed counsel that a hearing was scheduled for December 27, 1990. The hearing did not go forward in December 1990 and no further action on Anderson's charge was taken until March 1994, when the NYSDHR mailed a notice to the parties and their counsel scheduling a hearing before Acting Chief Administrative Law Judge James F. Wilcox. In connection with that hearing, ABI was ordered to produce documents responsive to all but one of the seven categories of documents subpoenaed by Anderson, including the personnel files of ABI employees to whom Anderson asserted he was "similarly situated."

Evidentiary hearings on Anderson's discrimination charges were held on April 5, 6, and 7, May 10, and July 19, 20, and 21, 1994, and continued on March 27 and 28, April 19 and 20, July 26 and 28, and November 1, 2, 21, 27, and 28, 1995.

ABI's counsel at the NYSDHR hearings on November 1, 1995 described ABI's difficulties finding documents:

[ABI is] encountering difficulties in locating and obtaining information. There are some issues related to computer capabilities of the system going back to 1982 and that time frame. Some of this

information by its nature would have had to been inputted into the system prior to 1982, and so the company has encountered difficulty locating information, retrieving information, confirming information.

Counsel for Anderson was present throughout the hearings, introduced documents into evidence, conducted examination of Anderson, and cross-examined the four witnesses who testified for ABI: Anglim, Forget, Williams, and Michael Beckman ("Beckman"), a Senior Director in ABI's National Retail Sales Department who testified concerning five other ABI employees who were terminated for falsifying company documents, one of whom was black. Testimony was also presented with respect to Forget's reports and the treatment of the five other terminated employees.

Meanwhile, on November 21, 1995, the EEOC advised ABI that the EEOC's case file on Anderson's charge had been destroyed "some time ago" and that only a computerized record remained, and that on April 1, 1986, the NYSDHR administratively closed its file, which resulted in the closing of the EEOC file.

On February 20, 1996, Judge Wilcox issued a ten-page Recommended Findings of Fact, Opinion, Decision and Order, which concluded that the evidence did not establish ABI had unlawfully discriminated against Anderson, and that his charge should be dismissed. The opinion found that Anderson had admitted submitting false call and expense reports, and had failed to establish ABI had treated similarly-situated persons differently for committing the same offenses.

The parties were advised of their right to file objections to his factual findings and recommended decision within 21 days of their receipt of the Order. Anderson, who then proceeded *pro se*, submitted 25 typed, single-spaced pages of objections to Judge Wilcox's findings.

On March 25, 1996, the NYSDHR adopted the factual findings and recommended decision of Judge Wilcox with minor changes and issued a Final Order dismissing Anderson's charge.

The NYSDHR advised Anderson of his right to appeal to the Supreme Court in the appropriate county within 60 days after his receipt of the Final Order. Anderson did not file any appeal in state court nor did he request, within 15 days of his receipt of the NYSDHR's Final Order, that the EEOC conduct a "substantial-weight review" of that agency's dismissal of his charge.

In May 1996, Anderson called and wrote to the EEOC and was told that the time for the EEOC to conduct a review of the NYSDHR's dismissal of his charge had passed, that his file had been closed, and that the EEOC had "no documentation on it."

On April 22, 1997, Anderson requested a right-to-sue letter from the EEOC without notice to ABI. The EEOC issued Anderson a right-to-sue letter on October 6, 1997, noting that its case file was closed "after hearing dismissing the complaint."

### Discussion

ABI has moved for summary judgment on three grounds: (1) the EEOC exceeded its authority by issuing Anderson a right-to-sue letter; (2) Anderson's claim is barred by the doctrine of laches; and (3) summary judgment is appropriate because, based on the undisputed facts, Anderson's claim must fail as a matter of law. These claims will be addressed in turn.

### I. The EEOC Had Authority to Issue the Right to Sue Letter

ABI has urged that it is entitled to summary judgment because the EEOC exceeded its authority in issuing Anderson a right-to-sue letter, without explanation or notice to ABI, after failing to take action in connection with Anderson's charge for nearly twelve years. ABI claims the EEOC has violated its statutory mandate

to resolve promptly employment discrimination claims, *see* 42 U.S.C. § 2000e–5(f)(1), and has abused its authority under Title VII. *See Springer v. Partners In Care,* 17 F.Supp.2d 133, 141 (E.D.N.Y. 1998) (noting the legislative intent behind Title VII and EEOC regulations "to encourage the speedy and efficient resolution of discrimination claims").

The EEOC is required to issue a Notice of Right–To–Sue when: (1) it has decided not to sue following the mandate of a reasonable cause finding and a failure to conciliate; (2) it has entered into a conciliation agreement to which the party claiming to be aggrieved has not joined; (3) it has dismissed a charge; or (4) it has made a finding of no reasonable cause. *See* 29 C.F.R. §§ 1601.19(a), 1601.28(b) (1999).

The EEOC must also issue a right-to-sue letter upon request:

> When a person claiming to be aggrieved requests, in writing, that a notice of right to sue be issued and the charge to which the request relates is filed against a respondent other than a government, governmental agency or political subdivision, the Commission shall promptly issue such notice as described in § 1601.28(e) to all parties, at any time after the expiration of one hundred and eighty (180) days from the date of filing of the charge with the Commission.

*Id.* § 1601.28(a)(1).

■ While it may be the case that the EEOC erred in not issuing Anderson a right-to-sue letter immediately following its adoption of the NYSDHR's Final Order of March 25, 1996, the phrase "at any time" of 29 C.F.R. § 1601.28(a)(1) appears to grant to the EEOC the authority to issue a right-to-sue letter on request of an aggrieved party for an unlimited period of time, and this Court cannot locate—nor has ABI indicated—any controlling authority indicating an interpretation to the contrary. *Cf. Springer,* 17 F.Supp.2d at 141 (affirming EEOC's authority to issue a right-to-sue letter more than ten years after the NYSDHR had issued a no probable cause determination in a former employee's Title VII action alleging discrimination).[1]

Nor is there a need in the instant case to address whether "at any time" means unlimited time. Here, the right-to-sue letter was issued less than two years after the NYSDHR's final determination. While it is certainly regrettable that the NYSDHR took so many years to dispose of Anderson's claim, and that the EEOC did not soon thereafter automatically issue Anderson a right-to-sue letter, under the language of 29 C.F.R. § 1601.28(a)(1) this Court cannot say that the EEOC thereby violated its statutory mandate. This Court therefore finds that the EEOC did not exceed its authority in issuing Anderson a right-to-sue letter.

## II. *The Doctrine Of Laches Will Not Be Applied*

ABI seeks dismissal on the additional ground that Anderson delayed before requesting a right-to-sue letter after he knew he had exhausted his administrative avenue of relief, and therefore is barred by the doctrine of laches.

■ "Laches is an equitable defense based on the … maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who sleep on their rights)." *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 259 (2d Cir.1997), *cert. denied,* 520 U.S. 1211, 117 S.Ct. 1695, 137 L.Ed.2d 821 (1997) (internal quotations omitted). Laches bars a plaintiff's equitable claim where he is "guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Id.*

---

1. ABI also claims that the EEOC had the authority to issue Anderson a right-to-sue letter in 1986, and would have been required to do so had Anderson requested one 180 days after his charge was filed. Yet this ignores the fact that Anderson had no reason to request such a letter while proceedings were pending before the NYSDHR.

Courts in this Circuit have been reluctant to dismiss discrimination complaints based upon the doctrine of laches. *See, e.g., Springer,* 17 F.Supp.2d at 141; *Myree v. Local 41, International Bhd. of Elec. Workers,* 789 F.Supp. 597, 616 (W.D.N.Y. 1992) (court declined to dismiss plaintiff's Title VII complaint on laches grounds even though he waited 10 years to request a right-to-sue letter); *cf. Ivani,* 103 F.3d 257, 262 (laches not available to bar otherwise timely § 1983 claim).

■ The instant case fails to meet either of the factors required to make out an affirmative defense of laches. First, Anderson has not been guilty of "unreasonable and inexcusable delay." *Ivani,* 103 F.3d at 259. ABI has repeatedly emphasized that eleven years passed between the time at which Anderson *could have* requested a right-to-sue letter, and the time at which he actually *did* request the letter. That time period, however, is irrelevant. Anderson had no reason to request a right-to-sue letter until the NYSDHR completed its investigation of his charge and the EEOC accepted the final determination of the NYSDHR in 1996. The request was made less than two years later. This does not constitute unreasonable and inexcusable delay, particularly in light of the fact that Anderson, at this point, was proceeding *pro se. See Myree,* 789 F.Supp. at 615.

In addition, ABI has made no showing that Anderson's delay will result in prejudice to ABI. Its sole claim of prejudice is that the "14–year delay has made it very difficult for ABI to contact three of its four witnesses who testified at the NYSDHR hearings in 1994–1995." As is apparent from ABI's statement, however, at the time of the NYSDHR hearings, at which ABI, of course, prevailed, between nine and ten years had already elapsed since the time of the alleged discrimination. ABI has made no claim that the additional four to five years that have elapsed since the NYSDHR hearings have caused those witnesses to become unavailable. Moreover, ABI has neither identified which potential witnesses it has had difficulty contacting, nor supplied any supporting materials indicating what—if any—specific efforts were made to contact those potential witnesses. "[I]t is well established that mere conclusory assertions as to anticipated difficulties in putting on a defense are not sufficient to constitute prejudice for purposes of establishing laches." *Springer,* 17 F.Supp.2d at 139.

Because ABI has neither demonstrated that Anderson is guilty of unreasonable and inexcusable delay in filing his claim, nor that ABI would be prejudiced by such delay, Anderson's claim will not be dismissed on the ground of laches.

### III. *Summary Judgment Is Appropriate*

#### A. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Additional considerations factor into a summary judgment motion in an employment discrimination action. *See Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo,* 22 F.3d at 1224. This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. The Second Circuit has made clear that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable."

*McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994); *see Meiri,* 759 F.2d at 998.

Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri,* 759 F.2d at 998; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather must set forth "'concrete particulars'" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

**B. Anderson Has Established a Prima Facie Case of Race Discrimination**

A plaintiff bringing an action under Title VII bears the burden of establishing a prima facie case of discrimination. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997). This involves showing that the plaintiff is: (1) a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir.1998); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The requirements for establishing

a prima facie case are not onerous. *See id.; Austin,* 149 F.3d at 152.

It is assumed that Anderson has satisfied the first three elements of his prima facie case: he is black, he was apparently qualified for his position as evidenced by his two promotions, and he suffered an adverse employment action. Anderson has attempted to meet the fourth element—that the circumstances surrounding the decision to terminate him give rise to an inference of race discrimination—by showing that a similarly situated individual not in Anderson's protected group—a non-African American—was treated differently. *See Shumway,* 118 F.3d at 63; *see also Taylor v. Runyon,* No. 97 Civ. 2425, 1997 WL 727488, at *5 (S.D.N.Y. Nov.20, 1997) ("In order to state a prima facie case of individual disparate treatment based on race, a Title VII plaintiff must allege that: (1) he was treated differently, (2) from a person of another race, color, gender, religion or national origin, (3) where the defendant intended to discriminate, and (4) where the defendant's intent to discriminate caused the difference in the plaintiff's treatment.").

■ Anderson's claim of differential treatment turns on ABI's investigation and retention of Forget. To be similarly situated, the other employee must have engaged in similar conduct and there must be no differentiating or mitigating circumstances to distinguish this conduct. *See Shumway,* 118 F.3d at 64.

According to Anderson, Forget, a white ABI zone manager, also falsified expense and call reports. Unlike.Anderson, however, Forget was notified of the possible discrepancies in his reports in advance of his meeting with his supervisors, thereby giving Forget time to compose explanations. ABI audited Forget's reports and concluded that there was nothing "suspect" about them.

While Anderson's claims fail to establish that Forget submitted false documentation and disobeyed a direct order, there is sufficient ambiguity in the record to support an inference of differential treatment. The basis on which Anderson was summoned to St. Louis to explain the discrepancies in his reports was not decidedly more substantial than the basis on which Forget was summoned. Yet Forget was notified in advance of the reason for the summons, while Anderson was apparently misled. That Anderson was not at the time able to explain to the satisfaction of ABI the discrepancies in his reports is not, therefore, altogether surprising.

Additional circumstances contributing to a permissible inference of discriminatory intent may "include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position, or the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citations omitted); *see Chojar v. Levitt,* 773 F.Supp. 645, 653 (S.D.N.Y.1991).

Anderson has stated that after his termination, his position was filled by a white man. This assertion, uncontested by ABI, may itself suffice to satisfy Anderson's burden of showing an inference of discrimination. *Cf. Hicks,* 509 U.S. at 506, 113 S.Ct. 2742 (no challenge to district court finding that plaintiff had satisfied requirements of prima facie case "by proving (1) that he is black, (2) that he was qualified for the position ... (3) that he was ... ultimately discharged, and (4) that the position remained open and was ultimately filled by a white man").

In sum, reading the evidence in the light most favorable to Anderson, this Court finds that Anderson has made out a prima facie case of discrimination.

### C. *ABI Has Articulated a Legitimate Purpose for Its Decision and Anderson Has Failed To Establish Pretext*

If a plaintiff makes out a prima facie case, the burden then shifts to the defen-

dant to articulate a legitimate, nondiscriminatory purpose for the adverse employment decision. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Austin,* 149 F.3d at 153; *Woroski,* 31 F.3d at 108. "Any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin,* 149 F.3d at 153; *see Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (*en banc*), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Once the employer satisfies its burden, the plaintiff may still prevail, but "only if [the] employer's proffered reasons are shown to be a pretext for discrimination." *Id.* (*quoting Fisher,* 114 F.3d at 1339). To make this showing, the plaintiff must demonstrate *"both* that the [proffered] reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742.

██ As set forth above, ABI has offered substantial credible evidence that Anderson's employment was terminated for legitimate, nondiscriminatory reasons: the submission of false reports and violation of the terms of his suspension. This satisfies ABI's burden of production, leaving Anderson with the burden of persuasion that ABI's nondiscriminatory reasons were merely pretextual.

However, there is insufficient evidence to support a showing of pretext. First, Cloud, who made the decision to fire Anderson, was the same person who twice promoted him. This "strongly suggest[s] that invidious discrimination was unlikely." *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997).

Second, Cloud did not unilaterally decide to terminate Anderson's employment. Williams, who had equal employment compliance responsibilities, assisted in coordinating the investigation of Anderson's reports, and determined that Anderson had falsified documents and had been insubordinate. That Williams was a member of Anderson's protected class and was charged with the responsibility of ensuring that any decisions regarding Anderson's employment were made in compliance with ABI's equal-employment-opportunity concerns and policies further weakens the inference of discrimination. *See Marlow v. Office of Court Admin.,* 820 F.Supp. 753, 757 (S.D.N.Y.1993), *aff'd,* 22 F.3d 1091 (2d Cir.); *Toliver v. Community Action Comm'n to Help the Economy, Inc.,* 613 F.Supp. 1070 (S.D.N.Y.1985), *aff'd,* 800 F.2d 1128 (2d Cir.) (if decision-maker is in same protected class as plaintiff, claims of discrimination become less plausible).

A conclusory allegation by Anderson that he must have been a victim of discrimination because he was black, and the second black salesman to have been discharged, does not supply a factual basis for inference sufficient to defeat ABI's motion for summary judgment. *See Meiri,* 759 F.2d at 998. "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Id.*

Anderson also has urged that ABI treated him differently from two other employees, Douglas Mackey ("Mackey") and Randy White ("White"). Mackey's reports were reviewed in mid 1987, almost two years after Anderson's discharge. Discrepancies between originals and copies were found, as well as inaccuracies, one of which is characterized by Anderson as double billing. Mackey, who was white, was not discharged. However, Anderson has failed to establish that Mackey had deliberately falsified his reports.

White, who had been asked three times to provide a passport photo to supervisors and had failed to do so, received an unfavorable performance rating, had irregularities in his reports, yet was not terminated until January 1988, over five months after investigation into his infractions began.

However, the difference in the investigation and the timing of the discharge do not constitute facts which infer discrimination.

 Further, of course, these precise issues were raised and litigated before the Chief Administrative Law Judge at the NYSDHR. While *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), makes clear that state agency findings are not "entitled to preclusive effect in Title VII actions in federal court," *id.* at 795, 106 S.Ct. 3220, this Court has the discretion to consider and weigh the probative value of the 2,118 page transcript of the NYSDHR hearings. *See Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60, 64 (2d Cir.1998) (establishing Second Circuit's rule that consideration to be given agency's determination is within trial judge's discretion, depending on its quality and factual detail).

Even assuming the facts in a light most favorable to Anderson, he does not dispute the material facts that he falsely reported meeting with clients with whom he had not met, sought reimbursement for business expenses he had not legitimately incurred or did not properly report, in violation of a company policy of which he was aware, and contacted at least four accounts during his 30-day suspension when he was expressly instructed not to do so.

Anderson's assertion in the face of these undisputed facts—that Forget, a fellow ABI zone manager who is white, was not terminated for committing the same expense report violations—is not supported by evidence to support disparate treatment. In fact, when Anderson first made this allegation, ABI promptly audited Forget's call and expense reports as it had audited Anderson's. The audit of Forget's reports revealed no credible evidence that Forget submitted false call reports or defied the terms of a suspension. ABI is therefore entitled the entry of summary judgment in its favor on Anderson's Title VII claim.

### Conclusion

For the reasons set forth above, ABI's motion for summary judgment is granted, and the complaint is dismissed with prejudice.

It is so ordered.