GLENVIEW CONSTRUCTION, INC.,
Joseph Alfonso and Maria
Alfonso, Plaintiffs,

v.

George P. BUCCI, Individually and as Supervisor of the Town of Newburgh, Town Board of the Town of Newburgh, J. Robert Folchetti & Associates, LLC, John E. Folchetti, Robert Petrillo, Individually and as Councilperson of the Town of Newburgh, and Nancy Lacolla, Individually and as Councilperson of the Town of Newburgh, Defendants.

No. 98 CIV 8646 WCC.

United States District Court,
S.D. New York.

Sept. 19, 2001.

Law Offices of Michael H. Sussman, Goshen, Christopher Watkins, Esq., Ste-

phen Bergstein, Esq., Of Counsel, for Plaintiffs.

Drake, Sommers, Loeb, Tarshis & Catania, PLLC, Newburgh, Bernard J. Sommers, Esq., Richard M. Mahon, II, Esq., Of Counsel, for Defendants George P. Bucci, Town of Newburgh, Robert Petrillo, and Nancy Lacolla.

Milber Makris Plousadis & Seiden, L.L.P., Garden City, Harry J. Makris, Esq., Of Counsel, for Defendants J. Robert Folchetti & Associates, LLC John E. Folchetti.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Glenview Construction, Inc. ("Glenview"), a general contracting construction company, and its owners and officers, Joseph ("J.Afonso") and Maria Afonso ("the Afonsos"), individually (collectively "plaintiffs"), bring the instant action against defendants George P. Bucci, Jr., individually and as supervisor of the Town of Newburgh (the "Town"), Robert Petrillo, individually and as councilperson of the Town, Nancy Lacolla, individually and as councilperson of the Town, the Town Board (the "Board") (collectively the "Town defendants"), J. Robert Folchetti & Associates, LLC ("JRFA") and John E. Folchetti, individually (collectively "the Folchetti defendants"). Plaintiffs assert a claim under 42 U.S.C. § 1983 for unlawful retaliation against the Town and Folchetti defendants and a claim for breach of contract against the Town defendants.[1]

Plaintiffs allege that defendants violated their constitutional civil rights by unlawfully retaliating against them for threatening legal action over a disputed municipal construction contract ultimately granted to plaintiffs by the Board. Defendants now move for summary judgment pursuant to FED. R. CIV. P. 56: 1) dismissing the § 1983 claim brought against all defendants; 2) dismissing all claims brought against Bucci, Petrillo and Lacolla individually; 3) dismissing all claims brought by the Afonsos individually; and 4) remanding the breach of contract claim to Orange County Supreme Court for trial. For the reasons that follow, the Town defendants' motion is granted in part and denied in part, and the Folchetti defendants' motion is granted.

### BACKGROUND

In late 1996, the Town contracted with JRFA, a construction engineering firm, to serve as the project engineer on a water main installation project for two dead-end streets in Newburgh, New York, namely Stanton Road and Dix Avenue (the "Stanton Road project"). Stanton Road required approximately 600 feet of an 8–inch ductile iron water main extension, Dix Avenue a similar extension of approximately 500 feet. As project engineer, JRFA was responsible for performing project design and administration services, including reviewing the contractors' bids on the project and making a recommendation to the Board for the award of the contract. Pursuant to New York General Municipal Law § 103, JRFA was required to recommend the "lowest responsible bidder."

JRFA evaluated the bids for the Stanton Road project by checking the contractors' numbers, interviewing the contractors' listed references and obtaining a Dun & Bradstreet financial report on the three lowest bidders. Based on its evaluation, JRFA concluded that Glenview had a sat-

---

1. The Amended Complaint also contains a § 1983 claim for violation of substantive due process (see Am. Complt. ¶ 57), which plaintiffs voluntarily withdrew with prejudice in a January 31, 2001 conference call held with the undersigned.

isfactory bid as to form, but expressed reservations because "none of [Glenview's] references could certify ductile iron experience on municipal projects." (Folchetti Dep. at 21–22.) On September 4, 1997, Folchetti met with Town Engineer James Osborne to discuss the evaluation, and Folchetti had at least a draft report prepared at this point. Plaintiffs allege that during this meeting, Osborne raised the possibility of trying to "get rid of" the two lowest bidders, Glenview and Noble Excavating ("Noble"), to reach the third lowest bidder, Alexandra Development Corporation ("Alexandra"). (*See* Folchetti Dep. at 75–78; Watkins Aff., Ex. 4.) Osborne opined that under New York law the Town probably could not bypass the two lowest bidders, both of which JRFA deemed qualified.

Folchetti and Osborne then met with Town Supervisor Bucci and Town Attorney Richard Drake to discuss JRFA's recommendation report. Osborne believes he showed the draft report to Bucci and Drake, but he is not absolutely certain. (Osborne Dep. at 34, 36.) Bucci does not recall being given any documents (Bucci Dep. at 16, 67), and Drake claims that he did not see the report at that meeting. (Drake Dep. at 14–15.) Osborne's and Folchetti's testimony disputes these assertions. (*Compare* Drake Dep. at 16–19, 29–30, 57–58 *with* Osborne Dep. at 23 and Folchetti Dep. at 21–25.)

The four men then discussed the legal risks of not awarding the contract to Glenview as the lowest bidder. (Folchetti Dep. at 80–81; Osborne Dep. at 36–37.) They also discussed Glenview's lack of experience installing ductile iron pipe and the potential impacts that would have on the project. Plaintiffs claim Folchetti understood that, by the end of the meeting, the men had reached a "consensus" to award the contract to Glenview (*see* Folchetti Dep. at 22–23), but Drake testified that

there was no such consensus. (Drake Dep. at 24.) After the September 4 meetings, Folchetti faxed a "final" report to Osborne that recommended selecting Glenview as the "lowest responsible bidder." (Folchetti Dep. at 23–24; Watkins Aff., Ex. 2.)

Plaintiffs claim that, according to Osborne, Drake and Bucci, the Board awarded the Stanton Road project to Alexandra at the September 6, 1997 executive session despite JRFA's report. (Pls. Mem. Opp. Summ. J. at 2–3 (citing Osborne Dep. at 44–45; Watkins Aff., Ex. 7).) However, Drake claims that JRFA's report was not discussed at the September 6 executive session. (Drake Dep. at 25, 29.) Osborne believes he gave the report to the Board at this session and that its recommendation of Glenview was the focal point of discussion, especially because the Board was concerned about potential construction cost overruns. (Osborne Dep. at 41–42, 46, 51–52.) He states that due to this concern, the Board told him to direct JRFA to create a second report recommending Alexandra as the "lowest responsible bidder" (*id.* at 57–58), and that this was done to protect the Town in the event that litigation resulted from awarding the contract to Alexandra, the third lowest bidder. (*Id.* at 66.) Drake disputes this assertion, stating that no such directive was issued, and Bucci does not recall one either. (Drake Dep. at 32, 54–55; Bucci Dep. at 41–42.)

After the September 6 executive session, Osborne directed JRFA to revise its report to recommend Alexandra, and JRFA complied. According to plaintiffs, on September 10, 1997, purportedly "based" on JRFA's second recommendation, the Board voted to award the contract to Alexandra. (*See* Osborne Dep. at 58; Watkins Aff., Ex. 6.) On September 11, the Town notified Alexandra that it was awarded the contract, and plaintiffs allege that Alex-

andra "immediately commenced preliminary work on the project." (Pls. Mem. Opp. Summ. J. at 4.) However, it is unclear whether Alexandra performed any preliminary work. (*See* Osborne Dep. at 73–74.)

Upon learning that the Town had awarded the contract to Alexandra, Fred Maute, Glenview's then attorney, inquired why Alexandra was awarded the Stanton Road project instead of Glenview. Plaintiffs claim Drake responded that "Alexandra got the contract 'based on the recommendation of the design engineer [Folchetti],'" but that "[a]s Osborne acknowledged during his deposition, this assertion was not true." (Pls. Mem. Opp. Summ. J. at 4 (citing Watkins Aff., Exs. 9, 12; Osborne Dep. at 58).) In fact, plaintiffs glean Drake's "assertion" from a note JRFA's secretary wrote memorializing a conversation with Osborne about the matter, wherein Osborne relayed his own impression of Drake's "opinion." (*See* Watkins Aff., Ex. 9.) Drake testifies that he told Maute to "do what you have to do" vis-à-vis the threatened suit because he believed the Town would prevail if Glenview brought an Article 78 proceeding. (Drake Dep. at 55–56.)

On September 17, 1997, Glenview filed a Freedom of Information Act ("FOIA") request for JRFA's September 4 report. Plaintiffs allege that the Town responded by giving Glenview only a copy of JRFA's September 11 report. (*See* J. Afonso Aff. ¶ 2.) Drake's testimony suggests, though, that only the version that was produced was kept in the Town's files, and that any other documents not initially produced were withheld inadvertently. (Drake Dep. at 59–66, 85–86.) Additionally, based on Osborne's testimony that the Board told him to direct JRFA to change its recommendation to protect the Town in the event that litigation resulted from award-

ing the contract to Alexandra (*see* Osborne Dep. at 66), plus the Town's failure to produce JRFA's initial report, plaintiffs allege that we "may reasonably infer that the Town threw away or otherwise destroyed its copies of the first [JRFA] report on or about September 18, 1997." (Pls. Mem. Opp. Summ. J. at 4.)

On September 18, 1997, Drake called Folchetti, told him about Maute's FOIA letter, and expressed his opinion that Glenview and Noble might sue the Town. Drake also told Folchetti that he did not know JRFA had submitted an initial report recommending Glenview. According to Folchetti, Drake seemed "very distressed" over the turn of events. Drake admits he thought that JRFA's initial recommendation of Glenview "looked bad" in connection with Glenview's potential suit against the Town. (Drake Dep. at 55–60; Folchetti Dep. at 91–97; Watkins Aff., Ex. 13.)

On September 24, 1997, Maute wrote Bucci (with a copy to Folchetti) that Glenview intended to file an Article 78 proceeding to have the Alexandra award set aside. That same day, in an executive session, the Board rescinded the Alexandra contract and awarded it to Glenview. The Board's minutes reflect that Drake advised the Board that "Alexandra ... is not, under New York law, the lowest responsible bidder." (Watkins Aff., Ex. 14.) Drake testifies that this was not his actual opinion and that he had advised the Board that, although it could legally have upheld the award to Alexandra, defending against Glenview's Article 78 suit would have been too costly. (Drake Dep. at 67–68.) On October 7, 1997, the Town awarded Alexandra a separate water main extension project (the "Country Meadow project") that had an almost identical construction budget and project completion schedule as the Stanton Road project.

Plaintiffs allege that "defendants immediately delayed the Stanton Road project by approximately four weeks, repeatedly rejecting Glenview's submittal documents as nonconforming," even though "[t]he Glenview submittal documents that defendants ultimately approved were essentially identical to those which they had repeatedly rejected." (Pls. Mem. Opp. Summ. J. at 6 (citing J. Afonso Aff., Ex. 1; Folchetti Dep. at. 60).) Folchetti states that although he felt plaintiffs' documents were *never* up to par, he "started to simply approve [them] with less regard to the format in order to get the project on the road." (Folchetti Dep. at 60.) J. Afonso acknowledges that JRFA had discretion as project engineer to determine whether the submittal documents conformed to the contract specifics. (J. Afonso Dep. at 11.) [2] He also admits that Glenview's submittal documents did not conform to the letter with the contract. (*Id.* at 16–18.)

Plaintiffs also claim that the Country Meadow project submittal provisions were identical to those of the Stanton Road project (*see* Watkins Aff., Exs. 17, 18), and that although Alexandra's submittal documents on that project were less complete than Glenview's rejected submittal documents on the Stanton Road project (*see* J. Afonso Aff., Exs. 1, 2), the Town approved Alexandra's documents without delay. However, the Country Meadow project engineer was Valdina Consulting Engineers, not JRFA. (Watkins Aff., Ex. 19.)

Plaintiffs further allege that they were treated differently from Alexandra regarding the use of plating, that is covering the excavations temporarily with steel plates, rather than backfilling them. The Stanton Road contract contains provisions allowing plating (*see* Watkins Aff., Ex. 20), but the Town told plaintiffs that it had a strict policy prohibiting plating. (*See* Osborne Dep. at 85 .) The Town thus required plaintiffs to backfill any open trench at the end of each working day. J. Afonso admits that Folchetti and Darryl Benedict, the Town Highway Superintendent in charge of the Stanton Road project, told him at the pre-construction meeting that he could not use plating. (J. Afonso Dep. at 35–36.) Nonetheless, the Town allowed Alexandra to use plating on the Country Meadow project, which was ongoing contemporaneously with the Stanton Road project. (Watkins Aff., Ex. 21; Osborne Dep. at 92–93.)

In April 1998, after plaintiffs assert that they had nearly completed the Stanton Road project, the Town asserted a claim for liquidated damages against Glenview for "failure to complete the work on or before the scheduled completion date." (Watkins Aff., Ex. 22.) Folchetti testifies that he was "surprised" by the Town's action and that the Town deviated from its normal practice by not consulting with JRFA, the project engineer, before asserting liquidated damages. (Folchetti Dep. at 129–30.) Plaintiffs also allege that the Town deviated from its own procedure, claiming that Bucci and Drake "unilaterally assessed liquidated damages against Glenview without any Town Board vote on the matter." (Pls. Mem. Opp. Summ. J. at 7 (citing Osborne Dep. at 106; Drake Dep. at 75).) Drake maintains that the Board was aware of the decision, and approved it by "just a discussion and a consensus." (Drake Dep. at 75.)

Plaintiffs claim that defendants actually caused the delays themselves "by unlawfully awarding Alexandra the contract and unjustifiably rejecting Glenview's submittal documents." (Pls. Mem. Opp. Summ.

---

**2.** Although J. Afonso was deposed numerous times, all citations to his deposition refer to that taken on April 3, 2001, unless otherwise noted.

J. at 7.) Plaintiffs also allege that although the Country Meadow project took twice as long to complete as the Stanton Road project and incurred greater construction and engineering cost overruns, the Town did not punish Alexandra in any way. (*See id.* (citing Drake Dep. at 76; Osborne Dep. at 112–13; Watkins Aff., Exs. 23, 24).) Plaintiffs further claim that the Town relied on a January 22, 1998 letter from JRFA to uphold the delay penalties, and that "the evidence suggests that it was written at the direction of the Town defendants." (Pls. Mem. Opp. Summ. J. at 8, n. 3.) Folchetti testifies that he did not need Town approval to correspond with Glenview (Folchetti Dep. at 103), and that he had no contact whatsoever with Bucci after the September 4 meeting. (*Id.* at 127–28.) Plaintiffs dispute the contents of the letter, but plaintiffs' attorneys did not question Folchetti at all about it during his deposition.

Plaintiffs also allege that they substantially completed the Stanton Road project as of April 17, 1998, when they requested a Certificate of Substantial Completion from the Town. (J. Afonso Aff., Exs. 4, 5.) They assert that JRFA admitted as much, stating in its moving papers that "Glenview's work began on November 20, 1997 and the job was completed *on or about April 17, 1998.*" (Pls. Mem. Opp. Summ. J. at 8 (emphasis in original) (citing Folchetti Defs. Rule 56.1 Stmt. No. 12).) Plaintiffs claim that at the Town's direction, JRFA did not issue a Certificate of Substantial Completion until May 27, 1998, which drove up the liquidated damages against Glenview and prevented it from being paid for its work. (*Id.* (citing Watkins Aff., Ex. 25).) Folchetti states that Glenview had not submitted all the proper documentation required by the contract to declare substantial completion (Folchetti Dep. at 120–22), and that he had no contact with anyone from the Town regarding substantial completion, which Osborne confirms. (Folchetti Dep. at 129–30; Osborne Dep. at 118–19.) Finally, plaintiffs allege that the Town issued Alexandra a Certificate of Substantial Completion several months before Alexandra actually completed the Country Meadow project. (Pls. Mem. Opp. Summ. J. at 8 (citing Watkins Aff., Exs. 26, 27).)

## DISCUSSION

### I. *Summary Judgment Standard*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. *Town Defendants*

### A. *Section 1983 Retaliation Claim*

"[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). As such, this right

> "cannot be impaired, either directly ... or indirectly, by threatening or harassing an [individual] in retaliation for filing lawsuits...." The [courts] ... make it clear that state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future.

*Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1428 (8th Cir. 1986) (internal citation omitted). "In order to establish a violation of a right of access to the courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.,* took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998). Additionally, a "[retaliation] case hinges on a more discrete dispute as to the defendants' true motives. If simple vindictiveness against the plaintiff on account of his ... lawsuit was the defendants' true motive, a First Amendment violation would be established." *Adler v. Pataki,* 185 F.3d 35, 45 (2d Cir. 1999).

### 1. *Liability of the Town*

The Town defendants argue that plaintiffs "have failed to even assert a 'policy' or 'practice' to support a federal claim under Section 1983." (Town Defs. Mem. Supp. Summ. J. at 5.) Plaintiffs contend that because Bucci is the Town Supervisor, he is "the Town's chief administrative officer," and thus "the Town is liable for his unconstitutional conduct." (Pls. Mem. Opp. Summ. J. at 13.)

"A municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior.*" *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (citing *Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Additionally, "[t]o hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Id.* (citation omitted). Where no municipal policy exists, "liability may nonetheless arise from 'a course of action tailored to a particular situation' by a municipal decision maker, provided that 'the decision maker possesses final authority to establish municipal policy with respect to the action ordered.'" *The Legal Aid Soc'y v. City of New York,* 114 F.Supp.2d 204, 231 (S.D.N.Y.2000) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). As the Second Circuit recently explained:

> Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather ... were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. It does not suffice for these purposes that the official has been granted discretion in the performance of his duties. Only those municipal officials who have final policymaking authority may by their actions

subject the government to § 1983 liability.

Whether the official in question possessed final policymaking authority·is a legal question, which is to be answered on the basis of state law. The relevant legal materials[ ] include state and local positive law, as well as custom or usage having the force of law. The matter of whether the official is a final policymaker under state law is to be resolved by the trial judge before the case is submitted to the jury.

[Moreover], the official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy in that area of the municipality's business. Thus, the court must ask whether the governmental official is a final policymaker for the local government in a particular area, or on the particular issue involved in the action.

*Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.) (internal citations, alterations, and quotation marks omitted), *cert. denied,* 531 U.S. 813, 121 S.Ct. 47, 148 L.Ed.2d 16 (2000).

█ Plaintiffs assert that "[t]he plethora of municipal responsibilities conferred upon Bucci under Town Law § 29(1)-(16) confirm that this Town Supervisor is a policymaker for the Town of Newburgh." (Pls. Mem. Opp. Summ. J. at 13.) We agree. Moreover, although the Board purportedly retained ultimate authority over all decisions concerning municipal contracts (*see* Bucci Dep. at 25; Drake Dep. at 58), it appears likely that Bucci had authority to act on his own. (*See* Osborne Dep. at 32: "[U]ltimately, it's the [S]upervisor *and* Board's decision as to who to award the contract to" (emphasis added).)

Furthermore, the evidence suggests that Bucci unilaterally imposed the liquidated damages on Glenview, or at least made the preliminary decision with Drake to assert them *before* presenting the issue to the Board. (*See* Bucci Dep. at 58–60; Drake Dep. at 75–76; Osborne Dep. at 102, 106; Folchetti Dep. at 129–30.) This act may have exceeded his authority but, because the Board ratified his decision (*see* Drake Dep. at 75), Bucci was effectively a final policy maker "on [that] particular issue involved in the action." *Jeffes,* 208 F.3d at 57. We therefore find that by alleging Bucci's responsibility for the decision, plaintiffs have sufficiently pled a § 1983 retaliation claim against the Town. And, of course, the Board is indisputably a policy maker for the Town and its actions are properly considered to be actions of the Town.

### 2. *Liability of the Board*

Plaintiffs claim that the Board retaliated against them for exercising their First Amendment right to seek judicial relief after the Board unlawfully awarded the contract to Alexandra. Glenview had a statutory right to the Stanton Road project as the "lowest responsible bidder." (*See* N.Y. GEN. MUN. LAW § 103.) Nonetheless, the Board sought to give that project to Alexandra. When Glenview threatened to invoke its First Amendment right to sue, the Board awarded it the contract, but ultimately withheld payment on that contract when it was substantially completed, and invoked liquidated damages against plaintiffs without consulting JRFA, the project engineer. The Town defendants claim that plaintiffs caused construction delays that resulted in the project running over budget, yet at least some of those delays were apparently attributable to the Town's own policies and practices.

█ Viewed in a light most favorable to plaintiffs, these events show that the Board may have acted out of "simple vindictiveness against the plaintiff on account

of his [threatened] lawsuit." *Adler,* 185 F.3d at 45. We therefore find that plaintiffs have created a triable issue of fact as to whether the Board unlawfully retaliated against them for invoking their First Amendment right to seek judicial redress, and thus deny the Town defendants' motion for summary judgment as to plaintiffs' § 1983 retaliation claim. Nonetheless, plaintiffs may not collect punitive damages against the Town. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) ("[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."); *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 262 (2d Cir.1997).

### 3. *Personal Liability of Board Members*

#### a. *Collectively*

##### (1) *Contractual Prohibitions*

■ Plaintiffs sue councilpersons Bucci, Petrillo and Lacolla in their individual capacities. (*See* Am. Complt. ¶¶ 8–10.) The Town defendants argue that the construction contract prohibits such suits. The contract provides, in relevant part:

> The Contractor agrees and represents that the Contractor shall make no claim and shall bring no action against any official or employee in his or her individual, personal capacity for any act, omission or statement made or done relating to or arising out of this Contract.

(Town Defs. Mem. Supp. Summ. J., Ex. C at GC–42.) The Town defendants thus contend that plaintiffs' claims against the above persons for personal liability should be dismissed. Plaintiffs do not address this argument. Nonetheless, our own research reveals that such a contract prohibition cannot bar § 1983 claims. *See, e.g., Van–Go Transport Co., Inc. v. New York*

*City Bd. of Ed.,* 53 F.Supp.2d 278, 284 (E.D.N.Y.1999).

In *Van–Go,* plaintiffs contracted with the NYC Board of Education ("BOE") and sued it for breach of contract and due process violations when the BOE refused to conditionally certify a replacement workforce for plaintiff's striking workers. *Id.* at 280–81. The contract contained a provision precluding suits against the BOE nearly identical to that in the instant case. *See id.* The court held that

> [n]owhere does the limitation provision in the [ ] contract express plaintiff['s] intention to waive statutorily protected federal rights.... If the parties to a contract intend for a provision to act as a bar to claims brought under federal law, they must specifically refer to such federal claims, and clearly express the intent to limit ... an action based upon federal claims. As the provision at issue makes no reference to federal statutory rights, much less an express waive of such rights, it cannot bar [plaintiff's] § 1983 claims.

*Id.* Although the court did not cite any authority and our research did not reveal a Second Circuit decision on point, we agree with Judge Trager's rationale. Therefore, we find that the construction contract's individual suit prohibition clause does not bar plaintiffs' § 1983 claims against the individual Board members.

##### (2) *Qualified Immunity*

■ As the Second Circuit has recently stated,

> a government official sued in his individual capacity is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not

clearly established at the time of the conduct; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken.' These three issues should be approached in sequence, for if the second is resolved, the third becomes moot; a favorable resolution of the first moots both the second and the third.

*X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 65–66 (2d Cir.1999) (internal citations and quotations omitted). Here, all 3 issues have been resolved in plaintiffs' favor. It is well settled both that First Amendment retaliation is actionable under § 1983 and that this was clearly established in 1997 and 1998. *See Bill Johnson's Rests.,* 461 U.S. at 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). Moreover, having already held that a jury may reasonably find that the Board intentionally retaliated against plaintiffs (*see supra* Section II.A.3.), it follows that the same jury may find that the Board's members did not act "objectively, legally and reasonably." *X–Men Sec.,* 196 F.3d at 66. Therefore, we cannot decide as a matter of law that the individual Board members are entitled to qualified immunity, *see Weyant v. Okst,* 101 F.3d 845, 857 (2d Cir.1996), and we deny the Town defendants' motion for summary judgment on this issue.

**b.** *Individually*

**(1)** *Bucci*

■ For the reasons detailed *supra* in Section II.A.1., we hold that genuine issues of material fact exist as to Bucci's individual liability. Moreover, as the Town defendants note, this case initially involved elements of "partisan politics." (Town Defs. Mem. Supp. Summ. J. at 16.) Thus, even though Bucci defeated Maute, plaintiffs' first attorney, "in the Republican primary election" (*id.*), a jury may reasonably believe that Bucci's actions against plaintiffs involved the " 'evil motive or intent' or 'callous indifference' that is essential to an award of punitive damages." *Ivani,* 103 F.3d at 262 (citing *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Therefore, we deny the Town defendants' motion for summary judgment dismissing plaintiffs' claim for punitive damages against Bucci.

**(2)** *Petrillo and Lacolla*

■ Councilpersons Petrillo and Lacolla were not sufficiently involved in the matter to be held personally liable. Having taken her position on the Board only in January 1998, Lacolla was not even a member at the time the Board awarded Alexandra the Stanton Road contract. (Lacolla Dep. at 5.) In fact, she only heard of the Stanton Road project for the first time in Spring 1998. (*Id.* at 9.) Thus, she had no motive to retaliate action against plaintiffs for threatening the Article 78 proceeding.

Petrillo, though present for the awarding of the contract, had only recently been elected, and admittedly "was just basically following the lead of the other ... councilpeople who had more experience in this kind of project than I had" with his vote. (Petrillo Dep. at 13–14.) Furthermore, he had no other involvement in the Stanton Road project until immediately before the instant suit was commenced. (*Id.* at 20–22.) Thus, his motivation to retaliate against plaintiffs for threatening the Article 78 proceeding was slight at best.

Moreover, neither Lacolla nor Petrillo played any part whatsoever in assessing liquidated damages against plaintiffs. (Lacolla Dep. at 12–13; Petrillo Dep. at 22–23.) We therefore grant the Town defendants' motion for summary judgment and dismiss all claims against Petrillo and Lacolla for individual liability.

## B. *Breach of Contract*

■ Plaintiffs' breach of contract claim is based in part on the Board's withholding of the payment due upon plaintiffs' substantial completion of the contract. Plaintiffs' § 1983 claim is based in part on the Board's assessment of liquidated damages against plaintiffs. Both claims are based in part on defendants' alleged interference and the resulting construction delays. The two claims are therefore inextricably intertwined. Thus, we will exercise supplemental jurisdiction over the breach of contract claim pursuant to 28 U.S.C. § 1367(c)(3). The Town defendants concede that triable issues of fact exist as to this claim. (*See* Town Defs. Reply Mem. Supp. Summ. J. at 2.) Therefore, having already found a triable issue of fact as to plaintiffs' federal claim (*see supra* Section. II.A.3.), we deny the Town defendants' motion to remand plaintiffs' breach of contract claim to state court.

## C. *The Afonsos' Individual Claims*

The Town defendants argue that "Joseph and Maria Afonso are not contractors under the municipal contract with the Town [ ] and lack standing to even assert contract or Section 1983 claims as plaintiffs." (Town Defs. Mem. Supp. Summ. J. at 16.) Plaintiffs do not oppose this argument. Moreover, because Glenview's only officers are the Afonsos, their interests are inextricably intertwined, and thus the Afonsos will realize any financial award Glenview recovers. Therefore, we grant the Town defendants' motion for summary judgment dismissing all claims brought against them by the Afonsos in their individual capacities.

## III. *Folchetti Defendants*

■ The Folchetti defendants argue that JRFA was merely an independent contractor and thus not a "state actor" that can be held liable under § 1983. However, because we grant them summary judgment on other grounds, we will assume for the purposes of this motion that JRFA was a state actor. Plaintiffs raise numerous arguments in support of their claim that JRFA acted in concert with the Board to retaliate against them for threatening to bring an Article 78 proceeding against the Board based on its award of the Stanton Road project contract to Alexandra.

Initially, we note that because JRFA was an independent contractor to the Board, it had no authority whatsoever to make any final decisions about Glenview. The evidence overwhelmingly shows that JRFA merely made recommendations to the Board that the Board chose to follow or not. (*See* Bucci Dep. at 14, 25; Drake Dep. at 24–25, 58–60; Osborne Dep. at 32.) Even when it changed its initial recommendation report, this was done at the Board's direction, and not of its own accord. (Folchetti Dep. at 27–28; Osborne Dep. at 52, 57–58.) Thus, JRFA had no reason to retaliate against plaintiffs, for plaintiffs' threatened Article 78 proceeding against the Board would not have impacted JRFA in any manner. Furthermore, although JRFA was pressured into withdrawing its original report finding that Glenview was the "lowest responsible bidder" and submitting a new report recommending award of the contract to Alexandra, this caused no ultimate injury to Glenview, which finally was awarded the contract.

Plaintiffs nonetheless argue that JRFA caused Glenview four weeks' delay by "repeatedly rejecting Glenview's submittal documents as nonconforming." (Pls. Mem. Opp. Summ. J. at 6.) In support thereof, plaintiffs point to Folchetti's September 18, 1997 conversation with Drake. However, J. Afonso admits that Glenview's sub-

mittal documents did not conform to the letter with the contract specifics (J. Afonso Dep. at 16–18), and that JRFA had the discretion as project engineer to make that determination. (*Id.* at 11.)

Plaintiffs also argue that JRFA refused to allow Glenview to use plating. (Pls. Mem. Opp. Summ. J. at 6–7.) However, Osborne testified that the construction contract "leaves the final decision for plating in the hands of the municipality." (Osborne Dep. at 88.) Folchetti also states that "[u]ltimately, [the decision not to allow plating] would have been [left to] the Town highway superintendent." (Folchetti Dep. at 99.) Moreover, J. Afonso's testimony confirms this fact, for he acknowledges that Benedict, the Town Highway Superintendent in charge of the Stanton Road project, told him he could not use plating at the pre-construction meeting. (J. Afonso Dep. at 35–36.)

Plaintiffs next argue that although they substantially completed the Stanton Road project as of April 17, 1998, "at the Town's direction, [JRFA] refused to issue a Certificate of Substantial Completion until May 27, 1998, [which] increased Glenview's liquidated damages and prevented it from being paid for its work." (Pls. Mem. Opp. Summ. J. at 8.) Assuming *arguendo* that plaintiffs' argument is true, JRFA's action was directed by the Town. Additionally, Folchetti testifies that Glenview had not submitted all the proper documentation required by the contract to declare substantial completion (Folchetti Dep. at 120–22), and that he had no contact with anyone from the Town regarding substantial completion, which Osborne confirms. (Folchetti Dep. at 129–30; Osborne Dep. at 118–19.) Thus, plaintiffs' argument is at best an unsupported, conclusory allegation, and at worse, does not suggest that JRFA acted with any retaliatory intent towards Glenview.

Most significantly, JRFA played no part at all in the decision to assert liquidated damages against plaintiffs, for Folchetti testified that he was "surprised" when he heard the news; JRFA was simply not consulted on that matter. (Folchetti Dep. at 129–30.) This is an undisputed fact alleged by plaintiffs themselves in the Amended Complaint (Am.Complt.¶¶ 17–18) and conceded in their opposition papers. (*See* Pls. Mem. Opp. Summ. J. at 7.)

Based on the evidence presented and plaintiffs' own self-defeating admissions, we find that neither Folchetti nor JRFA had any motive for retaliating against Glenview, and in fact did not. Therefore, the Folchetti defendants' motion for summary judgment dismissing plaintiffs' § 1983 retaliation claim is granted.

## CONCLUSION

For the reasons stated above, we grant summary judgment and dismiss all claims brought by Joseph and Maria Afonso individually, all claims brought by plaintiffs against Robert Petrillo and Nancy Lacolla in their individual capacities and all claims brought by plaintiffs against J. Robert Folchetti & Associates, LLC and John E. Folchetti. However, we deny summary judgment as to plaintiffs' claims for § 1983 retaliation against the Town of Newburgh and against George Bucci individually, and decline to remand to New York State Supreme Court plaintiffs' breach of contract claim against the Town of Newburgh.

SO ORDERED.